UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

STEVEN S. BROWN,                    )
                                    )
            Plaintiff,              )
                                    )
        vs.                         )        Case No. 2:10-CV-33 (CEJ)
                                    )
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
            Defendant.              )

### MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I. Procedural History

On November 2, 2007, plaintiff Steven S. Brown filed applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of November 25, 2004. (Tr. 116-23, 126-28). After plaintiff's applications were denied on initial consideration (Tr. 72-74), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 86).

The hearing was held on July 14, 2009. (Tr. 19-63). Plaintiff was represented by counsel. The ALJ issued a decision on September 8, 2009, denying plaintiff's claims. (Tr. 6-18). The Appeals Council denied plaintiff's request for review on March 5, 2010. (Tr. 1-3). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

### II. Evidence Before the ALJ

At the time of the hearing, plaintiff was 49 years old. He had obtained a GED and then completed two years of technical training in the area of automotive and

diesel. (Tr. 24). He resided in Bowling Green, Missouri with his wife and three children, ages 10, 11 and 13. (Tr. 45, 42).

Plaintiff had been employed as a laborer and supervisor in the construction field. (Tr. 24-25). He testified that he worked on a crew that replaced concrete foundations under natural gas compressor units all over the country. (Tr. 25). He operated an 80-pound rock drill and a 40-pound jack hammer to break up existing foundations and then helped to haul the rubble away in five-gallon buckets. (Tr. 25-26). Once the demolition was complete, he helped form the rebar and install the new concrete pad. (Tr. 27).

Plaintiff also worked as the supervisor of a residential weatherization crew. (Tr. 28). Plaintiff told the vocational expert that he estimated costs, gave bids, and ordered materials. (Tr. 58). He could read blueprints to a very limited extent. Id. He testified that his work consisted primarily of peeling roofing shingles and hauling away debris. At a job site in 2002, he routinely took a shortcut down from the roof, jumping three or four feet down into a Dumpster and from there to the ground. (Tr. 29). After doing this several times in a single day he was unable to walk when he woke up the following morning. An MRI of the spine indicated damage to his disks. (Tr. 30). He told the ALJ that in the past he had always been able to work through his back pain, but this event was different. He was unable to return to the company and never really resumed full-time work. (Tr. 30-31). As of the hearing date, he continued to have "terrible" back pain despite having had back surgery (Tr. 35); he had declined further surgery to repair a fracture because the first procedure had not provided any relief. (Tr. 40).

After plaintiff left employment, he attempted to operate his own home contracting business. He testified that he did work for his extended family and friends, because he could set his own pace. (Tr. 31, 34-35). He stated that he spent two days "down" for every one day of work he managed to complete, and he had stopped all work about three years before the hearing. (Tr. 31-32). His mother was providing most of the money his family needed to get by. (Tr. 35).

Plaintiff testified that he experiences pain "shooting down [his] legs . . . all the time." (Tr. 39). He cannot lift more than 10 pounds without experiencing pain and, in the month before the hearing, he had not lifted anything weighing more than a gallon of milk. (Tr. 36-37, 49). He cannot sit for much more than 30 minutes without having to stand and stretch. (Tr. 45). Similarly, he is unable to stand for very long. (Tr. 47). When walking, he needs to rest after a distance of one block. He stated that he is afraid to go for a walk because he is not sure he will be able to make it home again. (Tr. 47-48). Plaintiff testified that he gets out of bed five or six times a night because of the pain. A hot shower sometimes provides temporary relief. (Tr. 54).

In 2007, plaintiff had four injections of steroids into his rotator cuff. (Tr. 50). He testified that he experiences pain and numbness in his shoulders extending into his fingers, predominately on his right side. The discomfort occurs off and on all day and is particularly bad when he tries to sleep. (Tr. 51-52).

Plaintiff was diagnosed with chronic obstructive pulmonary disease (COPD) about two years before the hearing. (Tr. 37). His treatment consists of a nebulizer, which he uses about four time a day. (Tr. 48). He testified that he tried to swim for exercise, but he is frightened by needing to hold his breath under water and he cannot regain control of his breathing. Id. Plaintiff testified that he had started smoking when

he was fourteen years old.  (Tr. 37).  He was "well aware" of the "connection between COPD and cigarette smoking," and his family was "on [him] something terrible" about quitting.  Plaintiff testified that he had reduced his smoking to three cigarettes a day and he intended to ask his doctor about a trial of the nicotine-blocker Chantix.[1]  (Tr. 37-38).  In the meantime, he sought distraction by chewing gum and watching television.  (Tr. 38).

Plaintiff testified that he had received treatment for addiction to narcotics.  (Tr. 39).  He stated that he comes from a family that is "really against being on narcotics." (Tr. 39).  At one point, he decided that his pain was "psychosomatic" and "just in [his] head" and he quit taking the medication altogether.  Id.  On three occasions, he went for four weeks without the medicine.  He testified that "the first week [he] was sick and terrible.  And then some of that would surpass [sic].  And then it just got to where it was unbearable.  The never sleeping, the never being able to get in a comfortable position."  Id.  He got "so tired" from not sleeping and he experienced constant pain shooting down his legs.  Id.  When he returned to the doctor, "they'd go right back on the narcotics again."  Id.

The ALJ questioned plaintiff regarding a history of "drug-seeking behavior." Plaintiff testified that he went through "formal detox" and at the time of the hearing was taking the medication exactly as prescribed.  He attended a pain management clinic which prescribed a 30-day supply of medication at a time.  He knew that he would not obtain a refill before 30 days and had to abide by the plan.  He confined

---

[1]Chantix is indicated for use as an aid to smoking cessation treatment.  Serious neuropsychiatric events including depression and suicide have been reported in patients taking Chantix.  Phys. Desk. Ref. 2789 (65th ed. 2011)

himself to using one doctor and one pharmacy and did not seek drugs through an emergency room.  (Tr. 40-42).

With respect to the activities of daily living, plaintiff testified that he is able to dress himself, although his wife helps him put on his socks.  His wife made all the meals just as she always had.  (Tr. 42).  His son does the yard work.  (Tr. 43).  Plaintiff assists in small ways with household chores, such as carrying dishes to the sink or operating the vacuum cleaner.  He pushes the cart in the grocery store but denied picking up items to put in the cart.  Id.  He spends a lot of time on the computer or reading books at the library with his 10-year-old daughter.  He goes to the city pool with his 13-year-old daughter.   (Tr. 44).  Plaintiff testified that he once enjoyed hunting, but had not done so since 2000.  When asked about a notation in the medical records about hunting in 2008, plaintiff testified that he had merely accompanied his son and that he had not engaged in hunting.  (Tr. 55).

Jeffrey F. Magrowski, Ph.D., a vocational expert (VE), gave the following review of plaintiff's past work:  His work in concrete was "heavy to very heavy and unskilled;" his work as a supervisor qualified as medium and skilled.  His work as a contractor was skilled and, as performed by plaintiff, heavy, although it can be performed "at a light level" in the national economy.  (Tr. 59).  Id.  Plaintiff's skills were not transferrable outside the construction industry.

Next, the VE provided testimony in response to a hypothetical question based upon the Physical Residual Functional Capacity Assessment completed on December 14, 2007.[2]  (Tr. 75-80).  The ALJ asked him about the employment opportunities for

---

[2]The RFC Assessment did not note any limitations due to plaintiff's COPD. The ALJ added restrictions regarding fumes and dust to the hypothetical he posed.

a person of plaintiff's age, educational level, and past work experience, who is limited to performing light exertional work, in a dust- and fume-free environment, with occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 59, 78). The VE was also asked to assume that the individual should avoid concentrated exposure to extreme heat or cold and moderate exposure to vibration and unprotected heights. The individual can use his right arm two-thirds of the day with restrictions on overhead use. (Tr. 59-60). Dr. Magrowski opined that the hypothetical individual could not return to his past relevant work but could perform other jobs, such as bench assembly, office helper, and packing small items. (Tr. 61).

Plaintiff's counsel asked the VE to assume that the individual was limited to sitting for 30 minutes at a time, with breaks of 10 minutes every 30 minutes. In response, the VE stated that he knew of no jobs available for such an individual. (Tr. 61-62). Similarly, the VE knew of no jobs available for the individual if he could stay on task without taking breaks but with a "continual sit/stand option." Id.

The record contains a Disability Report completed by plaintiff on November 2, 2007. (Tr. 173-81). He listed "back problem" as the disabling condition. He was in constant pain and unable to sit or stand for any length of time or do physical labor. Plaintiff stated that he became disabled on November 25, 2004. (Tr. 174).

Plaintiff also completed a Work History Report and Missouri Supplemental Questionnaire. (Tr. 148-61). He had worked as a laborer and supervisor in the construction business. He stated he was kept from working by constant back pain, an inability to bend over, fatigue, and impaired breathing. (Tr. 150). He listed his

medications as Percocet,[3] Cozaar,[4] Combivent inhaler, Methadone,[5] and Tramadol.[6] The side effects included sleepiness, dry mouth, fatigue and jitters. He occasionally used a cane. (Tr. 151). He was able to complete a money order and count change. (Tr. 152). In response to a question asking which household tasks he could complete, plaintiff identified washing dishes, going to the post office, and taking out the trash.

Plaintiff indicated that he is unable to sleep due to pain and the need to move every 15 to 20 seconds. (Tr. 154). Elsewhere, he stated that he sleeps about 15 to 25 minutes at a time. (Tr. 161). He also stated that he was in too much pain to bathe everyday. He had no hobbies and in response to a question regarding his daily activities he stated that he "tr[ies] to move, . . . to have some kind of life." (Tr. 154). He stated that he cannot watch a 30-minute television show because he cannot sit or stand for more than 20 to 30 seconds without having to move his legs and back. Id. He is able to read newspapers, but denied playing video games, doing puzzles or using a computer. He has a driver's license and drives to the store and the doctor. Although he indicated he has difficulty leaving his house, he does so "at least 4-5 time a week," but stays only "minutes." (Tr. 155). In response to a question regarding his ability to

---

[3]Percocet is a combination of Oxycodone and Acetaminophen. Ocycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain. It can produce drug dependence. See Phys. Desk. Ref. 1114 (60th ed. 2006).

[4]Cozaar is indicated to reduce the risk of stroke in patients with hypertension and left ventricular hypertrophy, although there is evidence that the benefit does not apply to Black patients. See Phys. Desk Ref. 1937 (61st ed. 2007).

[5]Methadone is used to relieve moderate to severe pain that has not been relieved by non-narcotic pain relievers. It also is used to prevent withdrawal symptoms in patients who are addicted to opiate drugs. http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682134.html (last visited on March 9, 2011).

[6]Tramadol is prescribed for treatment of moderate to moderately severe pain. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

follow written and spoken instructions, plaintiff wrote, "I understand and I am not stupid." He does not need reminders to complete chores and has no difficulty getting along with others. He noted that, since having back surgery, he had tried to work but cannot do so without suffering. (Tr. 156).

In the narrative portion of the report, plaintiff wrote that he had tried hard to support his family. He prayed that he would get better after surgery but it "just got worse and worse." He wrote, "I have worked my whole life and now I can barely walk. Without some help soon we will be on the street." (Tr. 157).

The record includes a questionnaire completed by plaintiff's wife, Staci Brown. (Tr. 201-03). She identified his disabling conditions as severe back pain, chronic leg pain due to nerve damage, and lack of motion, lack of sleep, and depression. She stated that he was in pain "24 hours a day" and that the pain affected his attitude and appetite and kept him from "function[ing] on a daily basis with family, friends and children." She stated that he could walk three minutes and stand for five minutes before needing to sit or lie down. The heaviest item he could lift was a gallon of milk. He needed assistance with daily hygiene and he was unable to complete any household chores. She asserted that the pain impaired his ability to follow instructions and remember doctor's appointments.

### III. Medical Evidence

The medical record begins with an entry dated February 17, 2004, by neurosurgeon Michael Y. Oh, M.D., at the University of Missouri Hospital. (Tr. 253-55). Plaintiff's chief complaint was back and leg pain. He reported that he first injured his back eight to ten years earlier and had experienced increasing pain over the last two years. He described stabbing pain in his lower lumbrosacral region along the

paraspinal muscles, with aching pain down the thighs and legs with some numbness in the foot.  He rated his current pain level at 7 on a 10-point scale.  (Tr. 253-54).  The pain was worsened by lying down, standing, lifting, and walking and improved by sitting and bending.   (Tr. 254).   Upon examination, plaintiff appeared to be in moderate discomfort, with exaggerated pain response to axial loading.  There were no clinically significant findings in response to Spurling's Sign[7] or straight leg raise.[8] Plaintiff had symmetrical reflexes, no sensory deficits, and full strength in his upper and lower extremities.  He was able to toe walk.  He brought an MRI with him that showed some degenerative disk disease with 20 percent loss of height and no significant endplate changes.  He had no foraminal stenosis.[9]  Dr. Oh informed plaintiff that he had no surgical issues and recommended conservative treatments such as physical therapy, oral and epidural steroids, and facet injection.  (Tr. 255).

Plaintiff had x-rays of the lumbar and thoracic spine on March 24, 2004.  (Tr. 240-41).  There was a suggestion of spondylolysis (pars defect)[10] at L6 but no definite evidence of fracture.

On April 29, 2004, plaintiff presented to the Pike County Memorial Hospital emergency room with complaints of severe low back pain.  (Tr. 233-38).   On examination, he showed decreased range of motion, muscle spasm and vertebral point

_____

[7]Spurling's sign: Neck extension and lateral rotation that reproduces radicular pain suggest cervical disk disease.  The Merck Manual of Diagnosis and Therapy 325 (18th ed. 2006).

[8]When straight-leg raising induces muscle spasms it suggest intervertebral disk disease.  The Merck Manual of Diagnosis and Therapy 325 (18th ed. 2006).

[9]A stricture of any canal.  Stedman's Med. Dict. 1673 (26th ed. 1995).

[10]Degeneration or deficient development of a portion of the vertebra.  A lumbar vertebra may be weakened because of a congenital defect in the pars interarticularis, which is easily fractured.  Merck Manual 329 (18th ed. 2006).

-9-

tenderness. (Tr. 237). He reported that he had received a cortisone injection three weeks earlier and was scheduled to receive another within a few days. He complained that he was unable to function as a result of the pain. There is a notation that plaintiff reported a history of panic attacks. (Tr. 234). He was prescribed medication and was told to follow up with his doctor. Plaintiff was seen for emergency care again on May 29, 2004, for treatment of a toothache. (Tr. 228-32).

On July 2, 2004, plaintiff was seen by K. Cho, M.D., for an orthopedic consultation. (Tr. 226). MRIs completed on July 7, 2004, showed the thoracic spine to be within normal limits; there was degeneration of the disks at L4-L5 and L5-S1, with mild disk narrowing. Comparison with an MRI completed nine months earlier showed some increase in herniation. (Tr. 223-24). On July 16, 2004, Dr. Cho reviewed the new MRIs and recommended evaluation by a surgeon able to provide laminectomy. (Tr. 221). On August 20, 2004, plaintiff reported to Dr. Cho that he was unable to obtain an appointment at Barnes Hospital. Dr. Cho recommended that plaintiff seek an appointment at the University Hospital. (Tr. 219).

On September 10, 2004, plaintiff required emergency treatment at Pike County Memorial Hospital for flash burns to his arm and the side of his face. (Tr. 312). On January 3, 2005, he returned to the emergency room with complaints of back pain radiating down his thighs and along his shoulder. (Tr. 307). He stated that he was

scheduled for surgery but was presently out of Vicodin.[11]   He was treated with Toradol[12] and Nubain.[13]  Id.

Plaintiff returned to see Dr. Oh on January 18, 2005. (Tr. 251-52).  He reported that his back pain had increased.  He rated his level of pain at 3 on a 10-point scale but reported that it could be as high as 8 or 9.  He did not complain of any significant leg problems, with the exception of numbness and coolness in his right foot at night.  He reported that he did not benefit from physical therapy.  Dr. Oh reviewed the recent MRIs and found evidence of increased degenerative disk disease with some early endplate changes.  Dr. Oh recommended further conservative treatments.  Plaintiff stated that he was "desperate" to get something done because he did not want to be on pain medication.  He also stated that he did not want to be on disability but wanted to return to running his construction business.  Dr. Oh agreed to conduct a surgical work-up and ordered a bone scan and discogram.

A prescription summary in the record shows that between January 4, 2005, and February 22, 2005, plaintiff was prescribed Propo-N AP, Diazepam,[14] and OxyContin.[15]

_____

[11]Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain.  Dependence or tolerance may occur.  See Phys. Desk. Ref. 530-31 (60th ed. 2006).

[12]Toradol is "a trademark for preparation of ketorolac tromethamine," which is "a nonsteroidal antiinflammatory drug administered intramuscularly, intravenously, or orally for short-term management of pain[.]"  See Dorland's Illustrated Med. Dict. 1966, 998 (31st ed. 2007).

[13]Nubain, or Nalbupine, is an injectable analgesic.  http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682668.html (last visited on Mar. 9, 2011).

[14]Diazepam is used to relieve anxiety, muscle spasms, and seizures and to control agitation caused by alcohol withdrawal.  http://www.nlm.nih.gov/medlineplus /druginfo/meds/a682047.html (last visited on Mar. 9, 2011).

[15]OxyContin, or Oxycodone hydrochloride, is indicated for management of moderate to severe pain when a continuous round-the-clock opioid analgesic is needed

-11-

(Tr. 299). On February 28, 2005, plaintiff returned to the Pike County Hospital emergency room, complaining of severe back pain. He stated he was out of medication. (Tr. 301). He was treated with Tornadol and Vistaril[16] and received a prescription for OxyContin. Id. He returned on March 12, 2005, again complaining of severe pain and asserting that he was scheduled for surgery on March 18, 2005, but was presently out of pain medication. (Tr. 295). On April 18, 2005, plaintiff again presented at the emergency room, claiming he had surgery scheduled in 10 days but was presently out of medication. (Tr. 290). He received a prescription for OxyContin. (Tr. 293).

Plaintiff next saw Dr. Oh on April 27, 2005. (Tr. 243-45). A bone scintigraphy[17] was normal and showed no significant facet arthropathy.[18] (Tr. 250, 243-44). A discogram was positive at L5-S1 (Tr. 248-49, 244). Dr. Oh informed plaintiff that he was leaving the University Hospital and would be unable to perform surgery. He suggested plaintiff find another surgeon that would accept Medicaid.

Plaintiff returned to the Pike County Hospital emergency room on June 4, 2005, after sustaining a cut to his left index finger. (Tr. 285-88). On June 15, 2005, he returned with an injury to his right index finger. (Tr. 279-83). On June 20, 2005,

---

for an extended period. It is not for use on an as-needed basis. See Phys. Desk. Ref. 2879-80 (65th ed. 2011).

[16]Vistaril is indicated for the symptomatic relief of anxiety associated with psychoneurosis. See Phys. Desk. Ref. 2217 (52d ed. 1998).

[17]A diagnostic procedure consisting of the administration of a radionuclide with an affinity for the tissue of interest. Stedman's Med. Dict. 1602 (27th ed. 2000).

[18]Any disease affecting a joint. Stedman's Med. Dict. 150 (27th ed. 2000).

plaintiff complained of back pain and stated that he was out of medication. (Tr. 274-78). He received prescriptions for OxyContin and Flexeril.[19] (Tr. 275).

Plaintiff was seen by Janet Myers, D.O., at the Hannibal Clinic on June 29, 2005. He reported that he had a fifteen-year history of chronic back pain. He told Dr. Myers that he obtained no relief from a course of three epidural steroid blocks six months earlier. He was taking OxyContin twice a day with some relief, but he had run out of the medication a few days earlier. Examination revealed several lesions in the cervical, thoracic and lumbar areas with tenderness and paravertebral spasm. (Tr. 485). He had bilaterally decreased ranges of motion at the shoulders with marked tenderness at the bicipital tendons. He also had elevated blood pressure. (Tr. 486). Plaintiff was given injections of Depo-Medrol[20] to treat the bicipital tendons. He also received refills of his OxyContin and Flexeril prescriptions and was "firmly cautioned" that no further refills would be provided before one month.

Plaintiff had an office visit with Dr. Myers on July 26, 2005. (Tr. 484). He reported that his shoulder pain was improved and that he was tolerating his back pain more easily. He was very interested in pursuing surgery. He continued to show marked tenderness and spasm in the lumbar area. Dr. Myers ordered an MRI and refilled plaintiff's prescriptions for OxyContin and Flexeril. Id.

An MRI of the lumbar spine was completed on August 1, 2005. The radiologist found little change from an MRI performed in October 2003. There were normal

---

[19]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute musculoskeletal conditions. See Phys. Desk Ref. 1832-33 (60th ed. 2006).

[20]Depo-Medrol, or Methylprednisolone, is a corticosteroid used to relieve inflammation. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601157.html (last visited on Mar. 9, 2011).

signals from "the well aligned lumbar vertebral bodies." There was no spinal stenosis. The L4-L5 and L5-S1 disks showed bulging, but not significantly greater than in the earlier MRI. There was evidence of some degeneration of the lower disks. (Tr. 271).

Plaintiff saw Dr. Myers at the Hannibal Clinic at 8:15 a.m. on August 15, 2005, with complaints of sinus congestion. He received prescriptions for antibiotics and Deconamine.[21] (Tr.483). The record reflects that later that same morning, plaintiff presented at the Pike County Hospital emergency room with back pain and a complaint that he could not raise his arms. (Tr. 264). He received prescriptions for OxyContin and Flexeril. Id. On September 20, 2005, Dr. Myers refilled his prescriptions for OxyContin and Flexeril and gave him trigger injections for increased pain in shoulders. (Tr. 482). On September 29, 2005, plaintiff appeared at the Pike County emergency room with complaints of low-back pain after doing yard work. (Tr. 259).

On October 7, 2005, plaintiff was seen for an initial consultation by William W. Sprich, M.D., at the neurosurgery department at St. Mary's Hospital. (Tr. 358). Plaintiff reported that he had injured himself 10 or 15 years earlier and has been extremely uncomfortable. Conservative treatment did not provide relief. Dr. Sprich reviewed an MRI and noted some collapse of the disk space at L5-S1, a central protrusion of nuclear material at L4-L5 and "probably a central annular tear." Id.

Dr. Myers refilled plaintiff's Oxcontin and Flexeril prescriptions on October 19, 2005. (Tr. 481). On November 4, 2005, plaintiff reported to Dr. Myers that he was

---

[21]Deconamine, or Hydrocodone, "is in a class of medications called opiate (narcotic) analgesics and in a class of medications called antitussives. Hydrocodone relieves pain by changing the way the brain and nervous system respond to pain. Hydrocodone relieves cough by decreasing activity in the part of the brain that causes coughing." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (last visited on Mar. 9, 2011).

scheduled for surgery on November 22, 2005. At present, he was experiencing increased levels of pain in his back and shoulders. OxyContin was not providing relief and he was unable to sleep. Dr. Myers gave him prescriptions for the Duragesic[22] patch and Zanaflex.[23] (Tr. 480).

Plaintiff was seen at the Pike County Hospital emergency room on November 9, 2005, complaining of pain in his left small toe after shutting a door on it the night before. (Tr. 461). An x-ray indicated a fracture. (Tr. 458). He returned to emergency room on November 11, 2005, complaining of back pain. (Tr. 449-52).

Plaintiff saw Dr. Myers on November 18, 2005 for preoperative medical clearance. He complained of severe bilateral shoulder pain and said the Duragesic patches did not adhere well. He received trigger injections for his shoulders and refills of the OxyContin and Flexeril prescriptions. He told Dr. Myers he thought he might need detox after surgery in order to withdraw from the OxyContin. (Tr. 479). An MRI of the right shoulder[24] completed on November 21, 2005, indicated tendinosis and a possible partial tear of the supraspinatus tendon. (Tr. 447).

---

[22]Duragesic contains a high concentration of a potent Schedule II opioid agonist, fentanyl. Fentanyl can be abused and is subject to criminal diversion. It is indicated for management of persistent moderate to severe pain that requires continuous round-the-clock opioid administration for extended periods and cannot be managed by other means. It should only be used in patients who are already receiving opioid therapy who have demonstrated opioid tolerance. It may cause serious or life-threatening hyperventilation. Phys. Desk. Ref. 2684 (65th ed. 2011).

[23]Zanaflex is the brand name for Tizanidine and is used to relieve the spasms and increased muscle tone caused by multiple sclerosis, stroke, or brain or spinal injury. It is in a class of medications called skeletal muscle relaxants and works by slowing action in the brain and nervous system to allow the muscles to relax. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601121.html (last visited on Mar. 9, 2011).

[24]Plaintiff could not tolerate lying in the MRI machine long enough to complete the scan of his left shoulder. (Tr. 477).

On November 22, 2005, at St. Mary's Hospital, Dr. Sprich performed a two-level anterior discectomy and autograft fusion. (Tr. 320-26). Cages were placed at the L5-S1 and L4-L5 levels. (Tr. 321).

On November 30, 2005, plaintiff told Dr. Myers that his pain was "tremendously" reduced. (Tr. 478). He also reported that his shoulder pain was gone and that he was trying to quit smoking. Dr. Myers prescribed Duragesic patches, to be replaced every 72 hours. Id.

Plaintiff presented at the Pike County Hospital emergency room on December 8, 2005, complaining of back pain that he rated at level 10 on a 10-point scale. His incision showed no sign of infection. (Tr. 444). He stated that he had contacted Dr. Sprich's office for a refill of the Duragesic patch and learned that a prescription was en route to him by mail. However, plaintiff claimed that he was in immediate need of relief. He received two injections of pain medication and was discharged. Id. He returned to the emergency room on December 19, 2005, stating that he was once again out of medication. (Tr. 436-39). The physician contacted the pharmacy and learned that plaintiff had received a refill of Duragesic only nine days earlier. When confronted, plaintiff stated that he was not seeking Duragesic but "something to get him through the night." (Tr. 439). The physician refused and plaintiff left without signing discharge orders. Id.

Plaintiff saw Dr. Myers on December 28, 2005. He reported that he was in mild distress from pain in his shoulders and low back. The Duragesic did not give adequate pain control, he reported, because the patches did not adhere. He received injections to his shoulders. Dr. Myers discontinued the Duragesic and refilled his prescriptions for OxyContin. (Tr. 477).

On January 6, 2006, Katie Watson, R.N., a nurse in Dr. Sprich's office, saw plaintiff for postoperative follow-up. (Tr. 357). An x-ray indicated that the vertebral alignment was good and that there had been no changes since surgery. (Tr. 367). Plaintiff's incision was dry and healing. Plaintiff reported that he did not have any bowel or bladder problems. He was experiencing significant pain and was unable to do much. Ms. Watson adjusted the brace plaintiff was wearing and increased his dosage of Duragesic. (Tr. 357).

Plaintiff saw Dr. Myers on January 17, 2006. He complained of vomiting and pain. He told Dr. Myers he had increased his OxyContin from two tablets in the morning and one at night to three each time. He was nearly out of medication and thought he was in withdrawal. He also reported that he had a job opportunity in California supervising installation of cabinetry. Dr. Myers discussed with plaintiff the possibility of his entering a drug-treatment program on his return from California. She prescribed OxyContin, three tablets twice per day, but stated that she would not prescribe any more narcotics for him. A note indicates that the pharmacy reported that Medicaid would not cover the new prescription. (Tr. 476).

On February 17, 2006, plaintiff reported to Ms. Watson that he was "doing all right." His incision was healed and he was going to wean out of the brace. He was still complaining of a lot of pain. (Tr. 356). Lumbar spine x-rays showed no fracture or subluxation. (Tr. 343, 363). Ms. Watson discontinued the Duragesic patch and provided plaintiff with a 30-day supply of OxyContin. She noted that plaintiff would begin physical therapy. (Tr. 356).

On March 6, 2006, plaintiff told Dr. Myers that he had gone to California but had been unable to do the work because of back pain. He returned after three days. Dr.

Myers provided prescriptions for Duragesic and OxyContin, two tablets in the morning and one tablet in the evening.  She also prescribed Clonidine[25] to ease symptoms of withdrawal resulting from the reduced OxyContin dosage.  (Tr. 475).  On April 4, 2006, plaintiff reported to Dr. Myers that he was feeling better since he started the Clonidine.  She refilled his prescriptions for Duragesic, OxyContin, and Clonidine.   (Tr. 472).

On April 28, 2006, Ms. Watson opined that plaintiff was "strung out" and in a lot of pain.  (Tr. 355).  X-rays indicated good vertebral alignment and no compression deformity or change.  (Tr. 365).  A CT scan showed bone growth occurring.  (Tr. 364).

On May 24, 2006, plaintiff again presented at the Pike County Hospital emergency room with complaints of severe back pain.  (Tr. 425-29).

On August 11, 2006, plaintiff reported to Dr. Myers that he was doing construction work in Kansas City and that he intended to go into detox as soon as he had insurance.  (Tr. 473).  His blood pressure was elevated.  He also reported that he was not taking OxyContin at the moment, but was relying on Duragesic and Clonidine "once in awhile."  He stated he would like to try Methadone for the back pain.  Dr. Myers agreed to prescribe a one-month supply of Methadone.  He denied that he was receiving narcotics prescriptions from any other source.  Id.

Plaintiff presented to the Mexico Area Recovery Center for detoxification treatment on August 22, 2006.  (Tr. 372).  He was discharged on August 24, 2006, before completing the program.  No referrals were made "due to nature of discharge." (Tr. 371).

---

[25]Clonidine is indicated for treatment of hypertension.  See Phys. Desk Ref. 843 (61st ed. 2007).  It is also used in the treatment of alcohol and narcotic withdrawal. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682243.html (last visited Mar. 9, 2011).

Plaintiff was seen at the Pike County Memorial Hospital emergency room on September 10, 2006 with complaints of back pain. (Tr. 418-23). He reported that he was out of Vicodin. (Tr. 418). The doctor noted that in the past there had been a significant discrepancy between pharmacy records and plaintiff's reports regarding his prescription history. (Tr. 420). On this occasion the doctor informed plaintiff that he would not prescribe narcotics. (Tr. 421). Plaintiff was treated with Toradol. (Tr. 422).

The next day, plaintiff presented to Dr. Myers for refills of pain medication. He told her he had tried detox but that his back pain was as severe as ever and he had to start taking Methadone again. He had begun work but was physically unable to continue. He was having financial difficulties and reported that he was about to have his water supply shut down because he had not paid the bills. He was started on Hyzaar[26] and continued on methadone. (Tr. 470).

On October 9, 2006, plaintiff told Dr. Myers that his pain was much more manageable on methadone and that he had been able to work for four to six hours a day on a home remodeling job. He had run out of methadone two days early and she cautioned him not to do that again. She prescribed 120 pills for 30 days and told him to take only three pills on days when he was doing well. She also made changes in his blood pressure medication. (Tr. 469).

On November 8, 2006, plaintiff told Dr. Myers that he was able to work between four and six hours a day until his back began to hurt. The pain improved with rest. She refilled his Methadone prescription. (Tr. 468).

---

[26]Hyzaar is indicated for the treatment of hypertension. Phys. Desk. Ref. 2093 (65th ed. 2011).

Plaintiff presented to the Pike County Hospital emergency room on November 27, 2006, (Tr. 409-15) with complaints of back pain "due to absence of pain medication." (Tr. 413). At admission, plaintiff rated his pain at 10 on a 10-point scale. He was treated with Dilaudid[27] and shortly thereafter described his pain level as 3. (Tr. 414). He was discharged with a prescription for methadone. (Tr. 415).

Plaintiff's next recorded medical contact was with Dr. Myers on January 5, 2007. He reported that he was not working. On examination, he had tenderness and paravertebral spasm in the lumbar area. Dr. Myers refilled plaintiff's methadone prescription. (Tr. 467). Plaintiff received refills again on February 6, and March 6, 2007. (Tr. 465-66). On March 27, 2007, plaintiff reported that he was out of methadone. Dr. Myers made calls to local pharmacies and learned that plaintiff was receiving prescriptions from two other sources. She told him that no more narcotics would be prescribed and gave him a prescription for 30 methadone and Clonidine for withdrawal symptoms. (Tr. 464).

Plaintiff was seen at the Pike Medical Clinic on April 9, 2007, for complaints of back pain. (Tr. 503). He received prescriptions for Vicoprofen[28] and Cozaar.[29]

Plaintiff appeared at the Pike County Hospital emergency room on April 15, 2007, with complaints of a headache with vomiting. (Tr. 397-408). He reported that he had stopped taking methadone 10 days earlier. (Tr. 400). A CT scan of the head

---

[27]Dilaudid is a hydrogenated ketone of morphine indicated for management of pain. Phys. Desk. Ref. 2873-74 (65th ed. 2011).

[28]Vicoprofen combines the opioid analgesic hydrocodone bitartrate with the n-said agent ibuprofen. It is indicated for the short-term management of acute pain. Phys. Desk Ref. 578 (65th ed. 2011).

[29]Cozaar is indicated to reduce the risk of stroke in patients with hypertension and left ventricular hypertrophy, although there is evidence that the benefit does not apply to Black patients. See Phys. Desk. Ref. 1937 (61st ed. 2007).

was unremarkable.  (Tr. 406-07).  He was treated with Dilaudid, Phenergan,[30] Vistaril, and Toradol and discharged.  (Tr. 398).

Plaintiff returned to the Pike Medical Clinic on May 1, 2007.  On this visit, the treating physician assessed plaintiff as having an addiction to medication.  (Tr. 502).  Plaintiff returned to the emergency room on May 26, 2007, with complaints of vomiting and diarrhea.  (Tr. 388-95).  He also noted severe back pain.  (Tr. 392).  He was given Phenergan and discharged with instructions to rest and consume a clear liquid diet.  (Tr. 392-93).

An x-ray of the lumbar spine taken on June 22, 2007 indicated postoperative changes and narrowed intervertebral disk space.  There was no evidence of fracture or dislocation.  (Tr. 387).  A drug screen on July 12, 2007, was positive for Oxycodone, Propoxyphene,[31] and opiates.  (Tr. 385).

Plaintiff had a new-patient visit with Jeffrey Wells, D.O., at the Blessing Hospital, Palmyra Branch on July 24, 2007.  (Tr. 491-92).  He reported that he had been seeing Dr. Fisher in Columbia, Missouri, for pain management, but that and his family were moving to Palmyra, where his wife's parents live.  He also reported that he had "just got[ten] his insurance back."  Dr. Wells explained his pain management guidelines, which included a refusal to replace lost prescriptions or pills.

---

[30]Phenergan, or Promethazine, is used to relieve the symptoms of allergic reactions such as allergic rhinitis (runny nose and watery eyes caused by allergy to pollen, mold or dust), allergic conjunctivitis (red, watery eyes caused by allergies), allergic skin reactions, and allergic reactions to blood or plasma products.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682284.html (last visited on Mar. 11, 2011).

[31]Propoxyphene is used to relieve mild to moderate pain.  http://www.nlm.nih .gov/medlineplus/druginfo/meds/a682325.html (last visited on Mar. 9, 2011).

Plaintiff sought treatment for bronchitis at the Pike Medical Clinic on August 8, 2007. He was provided with Symbicort,[32] Avelox,[33] Combivent, and Depo-Medrol.[34] (Tr. 501). On August 29, 2007, plaintiff presented at the Pike County Memorial hospital emergency room. (Tr. 374-79). He stated that the day before he had fallen a distance of four feet, landing on his feet. (Tr. 375). An x-ray identified no injury resulting from the fall. (Tr. 505). He was treated with Dilaudid and Amitryptiline[35] and discharged. (Tr. 378-79).

On September 6, 2007, plaintiff saw Dr. Wells for follow-up. He reported that the pharmacy had only partially filled his last prescription for Percocet. (Tr. 493-94). Dr. Wells called the pharmacist, who initially reported that plaintiff had received the full prescribed amount. Dr. Wells told plaintiff he did not like being lied to and would discharge him as a patient if it happened again. After plaintiff left, the pharmacist called back and said that plaintiff had been correct – he had received only partial refills. Dr. Wells ordered a full refill and directed the pharmacist to inform plaintiff.

On October 15, 2007, plaintiff returned to Dr. Myers after an extended absence. (Tr. 463). He reported that he had been attending a pain clinic in Columbia, Missouri and had been off methadone for four months. He had recently stopped taking Percocet

---

[32]Symbicort is indicated for the treatment of asthma and COPD. Phys. Desk Ref. 713 (65th ed. 2011).

[33]Avelox is a broad-spectrum antibacterial agent. Phys. Desk Ref. 1939 (65th ed. 2011).

[34]Depo-Medrol, or Methylprednisolone, is a corticosteroid used to relieve inflammation. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601157.html (last visited on Mar. 9, 2011).

[35]Amitriptyline is a tricyclic antidepressant, sometimes used to treat eating disorders and post-herpetic neuralgia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html (last visited on Mar. 23, 2009).

-22-

and was experiencing withdrawal. He was requesting Ultram[36] and Tylenol with codeine, with a stated goal of "kicking the drugs" within a month. His mother had stated that she would stop providing financial support if he continued to use drugs. He could not afford the return trip to the Columbia pain clinic. Dr. Myers prescribed Ultracet[37] and Lunesta.[38]

On October 30, 2007, plaintiff reported to Dr. Wells that he was unable to sleep at night. He asked for OxyContin or Duragesic, which Dr. Wells refused. Instead, he explained the proper schedule for taking the prescribed Percocet. (Tr. 495-96). On examination, plaintiff's straight-leg test was equivocal.

Plaintiff presented to Dr. Myers on December 12, 2007, with symptoms of acute sinusitis and bronchitis. He complained of being unable to sleep due to congestion. His asthma was "acting up" as well. (Tr. 570). Dr. Myers prescribed an antibiotic, a decongestant, and cough syrup with codeine and refilled plaintiff's prescription for Ultracet. Id. He returned on December 14, 2007, complaining of continued coughing, headache, vomiting and diarrhea. (Tr. 569). He was given injections of Toradol, Depo-Medrol, and Kenalog.[39] Id. At an office visit on December 18, 2007, plaintiff

---

[36]Ultram is a centrally-acting synthetic opioid indicated for management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of pain for extended periods of time. See Phys. Desk. Ref. 2428-29 (63rd ed. 2009) (discussing extended release product).

[37]Ultracet is indicated for the short term (five days or less) management of acute pain. See Phys. Desk Ref. 1462-63 (60th ed. 2006).

[38]Lunesta, or Eszopiclone, is in the class of medications called hypnotics and is used to treat insomnia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605009 .html (last visited on Mar. 9, 2011).

[39]Kenalog is the "trademark for preparation of triamcinolone acetonide[,]" which is "an ester of triamcinolone; applied topically to the skin or oral mucosa as an antiinflammatory[.]" See Dorland's Illustrated Med. Dict. 992, 1986 (31st ed. 2007).

reported some reduction in coughing but he was experiencing shortness of breath. He was referred to a pulmonologist. He requested a refill of Ultracet. Dr. Myers noted that he had received 60 tablets four days earlier and denied the request. She directed him to follow the pain clinic protocol given to him by the pain clinic in Columbia. (Tr. 568).

On February 18, 2008, plaintiff reported to Dr. Myers that he had "creepy crawly sensations" and wondered whether he had restless leg syndrome. He had run out of his asthma medications and was experiencing wheezing. He had temporarily lost his insurance and had been unable to see the pulmonologist as scheduled. Otherwise, he was in no acute distress. Dr. Myers refilled his prescription for Albuterol and prescribed Requip.[40] (Tr. 567).

Plaintiff was seen at the Hannibal Regional Hospital on March 20, 2008, with complaints of low back pain. (Tr. 566). A lumbar myelogram disclosed a compression fracture at T12. (Tr. 510).

On February 26, 2008, plaintiff informed Dr. Wells that he was experiencing some depression and anxiety as a result of being unable to work and pay bills. He denied suicidal or homicidal ideation. (Tr. 544-45). Dr. Wells made a referral to the Mark Twain Area Counseling Center and refilled his prescriptions for Percocet and Cozaar, and started him on Amitriptyline.

On April 14, 2008, Dr. Myers noted that plaintiff's wife stated he had just been released from jail for theft. He received prescription for treatment of acute sinusitis and possible bronchitis. With respect to pain management, Dr. Myers recommended

_____

[40]Requip is a non-ergoline dopamine agonist indicated for the treatment of restlessleg syndrome. Phys. Desk Ref. 1527 (65th ed. 2011).

that plaintiff keep an appointment with the Columbia Pain Control Unit. (Tr. 566). An MRI completed on April 28, 2008, showed a mild superior endplate compression deformity of T12 and a tiny central disk protrusion at T5-T6 which did not impinge on the thoracic cord or produce central canal stenosis. The thoracic cord had an intrinsically normal appearance. (Tr. 582).

On June 11, 2008, Dr. Myers sent plaintiff to the emergency room after he presented with shortness of breath and complaints of fever and sweating. (Tr. 564). Plaintiff was admitted to the hospital, where he was diagnosed with hepatitis-C, likely chronic. (Tr. 518). He was discharged with prescriptions for Albuterol, Advair, Cozaar, and Oxycodone. Id.

Plaintiff had an office visit with Dr. Wells on June 20, 2008. (Tr. 546-47). Dr. Wells noted that plaintiff must eliminate Tylenol and Percocet, and may use only Oxycodone. With respect to treatment for hepatitis, Dr. Wells informed plaintiff that "with his history of depression [and] being on Amitriptyline, . . . he would have to be closely monitored with oral Ribavirin[41] and take interferon shots weekly." (Tr. 546).

Plaintiff saw Dr. Myers on September 11, 2008. He complained of shortness of breath and pain in his shoulders, arms, calves and back. He reported that breathlessness sometimes woke him from sleep. Upon examination, plaintiff had 14 tender points, from which Dr. Myer diagnosed possible fibromyalgia. She prescribed Lyrica[42] and refilled his Advair prescription. (Tr. 563). On September 19, 2008,

---

[41]Ribavirin is used with an interferon to treat hepatitis C. It is in a class of antiviral medications called nucleoside analogues. http://www.nlm.nih.gov/medlineplus /druginfo/meds/a605018.html (last visited on Mar. 9, 2011).

[42]Lyrica, or Pregabalin, is an anticonvulsant indicated for the treatment of neuropathic pain and postherpetic neuralgia and for the management of fibromyalgia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605045.html (last visited on

plaintiff reported to Dr. Myers that he experienced pain relief with Lyrica. (Tr. 562). On October 8, 2008, plaintiff presented with an abdominal hernia near the site of his spinal surgery incision. He appeared disheveled. (Tr. 561).

Plaintiff was evaluated by pulmonologist Prana R. Parikh, M.D., on October 16, 2008. Dr. Parikh recommended allergy tests and a round of treatment with prednisone. (Tr. 557-59). Plaintiff also saw Dr. Wells on October 16, 2008. (Tr. 695-96). He asked for an increase in his pain medication and Dr. Wells refused. Dr. Wells noted that plaintiff "still bow hunts and gun hunts."

Plaintiff presented to the emergency room of the St. Joseph Health Center on November 6, 2008, with complaints of pain in his back and legs. He was presently undergoing treatment of narcotic addiction at Ridgeway Center and was experiencing withdrawal. (Tr. 595). He responded well to treatment with Clonodine and methadone. (Tr. 596, 598).

On November 18, 2008, Dr. Myers noted that plaintiff had just completed a treatment program and was no longer taking narcotics. He reported that he was experiencing cravings and back pain. Plaintiff requested prescriptions for Suboxone[43] and ReVia,[44] which he had been told would help with cravings. Dr. Myers agreed to prescribe ReVia. (Tr. 587).

_____

Mar. 9, 2011).

[43]Suboxone, a combination of buprenorphine and naloxone, is used to treat opioid dependence. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605002 .html (last visited on Mar. 9, 2011).

[44]ReVia, or Naltrexone, is an opiate antagonist that blocks the effects of opioid medications. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a685041.html (last visited on Mar. 9, 2011).

On February 6, 2009, Dr. Wells noted that plaintiff was participating in chronic pain classes.  He denied plaintiff's request to increase his Oxycodone.  (Tr. 698).  On examination, plaintiff had normal strength of the grip bilaterally and upper and lower extremities, also bilaterally.  There were no focal, sensory or motor defects.  Id. Plaintiff appeared as scheduled for medication refills on June 10, 2009.  (Tr. 700).

## IV.  The ALJ's Decision

In the decision issued on September 8, 2009, the ALJ made the following findings:

1.   Plaintiff met the insured status requirements of the Social Security Act through June 30, 2008.

2.   Plaintiff had not engaged in substantial gainful activity since November 25, 2004, the alleged onset date.

3.   Plaintiff has the following severe impairments: chronic back pain and COPD.

4.   Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   Plaintiff has the residual functional capacity to perform light work, with limitations to occasional climbing of ramps, ladders, stairs, scaffolds, and ropes; no concentrated exposure to dirty, dusty environments or fumes; no more than frequent use of his right arm, up to two-thirds of the day, for overhead activity.  In addition, he must avoid moderate exposure to vibration and moving machinery.

6.   Plaintiff is unable to perform his past relevant work.

7.   Plaintiff was 44 years old, a younger individual, on the alleged date of onset.

8.   Plaintiff has at least a high school education and is able to communicate in English.

9.   Transferability of job skills is not material to the determination of disability using the Medical-Vocational Guidelines.  See 20 C.F.R. Part 404, Subpart P, App. 2.

10.  Considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can do.

11.  Plaintiff was not under a disability, as defined in the Social Security Act, from November 25, 2004, through the date of the decision.

(Tr. 11-18).

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings."  Nimick v. Secretary of Health and Human Serv. 887 F.2d 864 (8th Cir. 1989).  The ALJ first determines whether the claimant is engaged in substantial gainful activity.  If the claimant is so engaged, he is not disabled.  Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.  Third, the ALJ determines whether the claimant's impairment meets or is

-28-

equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.
If the claimant's impairment is, or equals, one of the listed impairments, he is disabled
under the Act. Fourth, the ALJ determines whether the claimant can perform his past
relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot
perform his past relevant work, the ALJ determines whether he is capable of
performing any other work in the national economy. If the claimant is not, he is
disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S.
137, 140-42 (1987).

### A.    Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based
on legal error and if there is substantial evidence in the record as a whole to support
the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187
(8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so
that a reasonable mind might find it adequate to support the conclusion." Estes v.
Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), (quoting Johnson v. Apfel, 240 F.3d
1145, 1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence
could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial
evidence, the Court reviews the entire administrative record, considering:

1.    The ALJ's credibility findings;

2.    the plaintiff's vocational factors;

3.    the medical evidence;

4.    the plaintiff's subjective complaints relating to both exertional and
      nonexertional impairments;

5.    third-party corroboration of the plaintiff's impairments; and

-29-

6.    when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence.  Pearsall, 274 F.3d at 1217, (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

### B.    Analysis

Plaintiff contends that the ALJ improperly assessed his credibility; improperly evaluated his complaints of pain in determining his Residual Functional Capacity (RFC); and improperly rejected the Vocational Expert's testimony that plaintiff is unemployable.

### 1.    The ALJ's Credibility Determination

"In order to assess a claimant's subjective complaints, the ALJ must make a credibility determination by considering the claimant's daily activities; duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions."  Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant.  Wheeler v. Apfel, 224 F.3d 891, 895 (8th Cir. 2000).  A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those

complaints into question. Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006). Although an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary. Id. (quoting Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir.2002)). The determination of a plaintiff's credibility is for the Commissioner, and not the Court, to make. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). Where an ALJ explicitly considers the Polaski factors and discredits the plaintiff's complaints for good reason, the courts will normally defer to that decision. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001), (quoting Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990)).

Plaintiff alleged that he suffers debilitating back pain that prevents him from lifting more than 10 to 15 pounds. He also stated that, as a result of his COPD, even short walks leave him exhausted. In addition, he has pain in both shoulders with constant numbness from his shoulders to his fingers. The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, the ALJ found that plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the RFC assessment. (Tr. 16).

The ALJ carefully considered the medical record in assessing plaintiff's credibility. He noted that, on physical examination, plaintiff had no focal sensory or motor defects. Furthermore, recent MRIs indicated only mild endplate compression deformities and mild facet arthropathy. In addition, there were no clinical signs typically associated with chronic pain, such as muscle spasms, neurological deficits, muscle atrophy, or

abnormal radiologic findings. (Tr. 16-17). The absence of objective clinical findings is a proper basis for discounting a claimant's subjective complaints of pain. <u>Forte v. Barnhart</u>, 377 F.3d 892, 895 (8th Cir. 2004). Although plaintiff sought extensive treatment, the bulk of his medical contacts were for prescription refills. He had not received "intensive treatment modalities," such as steroid injections, nerve blocks, or physical therapy for treatment of his back pain. In addition, the ALJ noted that no treatment provider had ever opined that plaintiff was unable to work or imposed limitations on activities of daily living or work. <u>See Brown v. Chater</u>, 87 F.3d 963, 965 (8th Cir. 1996), (<u>citing Smith v. Shalala</u>, 987 F.2d 1371, 1374 (8th Cir. 1993) (lack of significant medical restrictions inconsistent with claims of disabling pain).

Plaintiff challenges the ALJ's consideration of his substance abuse. "An individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled. 42 U.S.C. §§ 423(d)(2)(C), 1382(a)(3)(J). The claimant has the burden to prove that alcoholism or drug addiction is not a contributing factor. <u>Kluesner v. Astrue</u>, 607 F.3d 533, 537 (8th Cir. 2010) (<u>citing Estes v. Barnhart</u>, 275 F.3d 722, 725 (8th Cir. 2002)). In this case, however, the ALJ neither determined that plaintiff was disabled or that his substance use was a contributing material factor. Indeed, the ALJ determined that plaintiff's opiate dependency was in full remission. (Tr. 11). Nonetheless, the ALJ properly noted plaintiff's pattern of drug-seeking behavior as a possible explanation for the number and frequency of plaintiff's visits to physicians and hospitals. <u>See Anderson v. Shalala</u>, 51 F.3d 777, 780 (8th Cir. 1995) ("[T]he repeated indications that Anderson seeks medication and medical treatment without cause also tend to vitiate her claims of disability by casting a cloud of doubt over the legitimacy

of her numerous trips to the hospital. This drug-seeking behavior was not so pervasive, however, as to affect her work capabilities and give rise to a claim of disability in itself.")

Plaintiff states that his work history favors a finding that he is disabled. The Commissioner counters that plaintiff's earning record is not wholly favorable to his claim because he had many years with minimal or no earnings even before he allegedly became disabled.[45] (Tr. 140). In addition, the ALJ noted that plaintiff worked at different times throughout the alleged period of disability. A record of contemplating work supports a finding that a claimant did not view his pain as disabling. Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995).

Based on the foregoing, the Court cannot say that the ALJ's credibility determination was unsupported by the record as a whole.

### 2. The ALJ'S Residual Functional Capacity Determination

The RFC is the most that a claimant can do despite physical or mental limitations. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); § 404.1545. It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations. Id. Ultimately, however, the determination of residual functional capacity is a medical issue, Singh v. Apfel, 222 F.3d 448, 451 (8th Cir.

_____

[45]The Summary of FICA Earnings shows that plaintiff had no qualifying earnings in the years 1983 through 1988. In the years before 1993, plaintiff never earned more than $8,500 and in four of those years he earned less $700. (Tr. 140).

2000), which requires the consideration of supporting evidence from a medical professional, Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The ALJ determined that plaintiff retained the Residual Functional Capacity to perform light work with some restrictions.[46]  Plaintiff contends that the ALJ's determination failed to take into account his severe pain.  As discussed above, however, the ALJ did not find plaintiff's allegations of disabling pain to be credible and thus properly excluded them from the RFC determination.  See Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (ALJ's RFC determination was "influenced by his determination that [plaintiff's] allegations were not credible").

Plaintiff also argues that the RFC determination is improper because the ALJ did not complete a function-by-function assessment of the seven "strength demands"[47] as required by S.S.R. 96-8p, 1996 WL 374184, at *1.  "This ruling cautions that a failure to make the function-by-function assessment 'could result in the adjudicator overlooking some of an individual's limitations or restrictions.'" Depover v. Barnhart, 349 F.3d 563, 567 (8th Cir. 2003).  In this instance, plaintiff testified about his limitations with regard to these functions and the ALJ made specific findings with respect to some of them.  The failure to explicitly address each function does not mean that any were overlooked.  See id. ("We think instead that the record reflects that the ALJ implicitly found that Mr. Depover was not limited in these areas.")  The ALJ's RFC

---

[46]Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  20 C.F.R. § 404.1567(b).

[47]These are sitting, walking, standing, lifting, carrying, pushing, and pulling.  20 C.F.R. § 404.1545(b).

determination is not undermined by the failure to address the functional limitations of impairments he did not find credible.

### 3.   The ALJ's Finding that Plaintiff Can Perform Other Work

Plaintiff argues that the ALJ erred improperly ignored the VE's testimony that no jobs existed for an individual with plaintiff's RFC plus the additional requirement of a 10-minute break after every 30 minutes of sitting.  A hypothetical question to the VE need only include impairments that are supported by the record and which the ALJ accepts as valid.  Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000).  The ALJ was not required to adopt the VE's testimony in response to a hypothetical that included limitations the ALJ did not find credible.

### VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.  Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [Doc. #13] is **denied**.

A separate Judgment in accordance with this order will be entered this same date.

Carol E. Jackson
_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 23rd day of August, 2011.